United States v. Odum. Ms. Baldwin, whenever you're ready. Thank you, your honors. Good morning. May it please the court. Melissa Baldwin on behalf of the appellant Yakotus Odum. Since 1893, it has been error to omit the mens rea requirement from an aiding and bedding instruction as the district court did here. That error was especially damaging here because it turned Mr. Odum's defense that his cousin borrowed his car to commit the robbery into a basis for conviction rather than acquittal. Moreover, the instruction never should have even been given because there wasn't an evidentiary foundation to support it. So here, the government argued and tried the case as one of principal liability. That there was one robber and Mr. Odum was that robber. That same evidence did not also support finding someone else was involved in the robbery and Mr. Odum, therefore, could be held liable as aiding and abetting the robbery. How did that affect your substantial rights? We objected. We objected to giving an aiding and abetting instruction, so that is under abuse of discretion. So it's the government's obligation to prove it was harmless error. And so here they can't do it. Just so I understand, you objected to the giving of the instruction, but not to the instruction given. So we review the contents of the instruction for plain error. We review the giving of the instruction for an abuse of discretion. Correct, Your Honor. And that's partially because of Rule 30D, which requires a specific objection to the content of the instructions. So because we didn't lodge an objection to simply reading aiding and abetting statute, that's for plain error. But we did object and pointed the district court to the lack of evidence to support aiding and abetting. Can I just ask the question that may have been Judge Motz's question, but maybe not? In light of cases like Moody, where we sort of have two alternative theories under plain error, so if we assume that the jury instruction was plainly erroneous here, but where we've got two theories, one of which we've got a problem with, we tend not to find, you know, the third and fourth prong of plain error review. So long as the one theory here, principal liability, you know, there was sufficient evidence. Can you help me understand on the what's in the instruction argument, how we get to plain error? And we can talk about the abuse of discretion point, but they're separate arguments. I understand, Your Honor, and part of why it's an abuse of discretion is because the jury here likely did rely on aiding and abetting based on the fact they acquitted of brandishing. Brandishing wasn't contested here, and the instruction was... All right, I want to come back to the question I asked, which you didn't answer, but I'll go to that question. Why do you make the jump that we can assume based on results what the jury did? I mean, we often say that, like, the jury is a black box for a reason. And, you know, you and your colleague here have been in the well of a courtroom enough to know that trying to understand what a jury did based on the results that came out is a fool's errand, right? Like, it is not an effective means of determining what happened in the room. And we don't generally allow courts to do that, right? That's the sort of point. It is a black box for a reason. Sure. So two points on that, and then I'll go back to Moody and Ali. So the two points is, for that question, is first, we assume the jury follows its instructions. And here the jury was told, if the robber displays a firearm to obtain property, that's brandishing. And the jury saw the robber display the gun and heard the cashier testify she handed over the money because a gun was pointed at her face. And then the second point being, I don't have to show that the jury actually did rely on aiding and abetting. Here I have to show a reasonable probability. And the acquittal on brandishing shows a likelihood that the jury did in fact rely on accomplice liability. And the Seventh Circuit similarly relied on a deadlocked count presenting a similar issue to find a reasonable probability of a different outcome in the Cook case. Now I want to go back to the Moody and Ali point because I do think that's the government's, what they're resting their case on here. And it's just very clear. So Olano and the plain error standard is you show an effect on substantial rights by showing a reasonable probability that but for the error, the outcome would have been different. The government is trying to turn this Court's cases in Moody and Ali and Hastings from statements about the burden of proof into one of standard of proof. And what I'm saying there is Moody and Ali said, listen, the defendant has the burden of showing prejudice under plain error, and they didn't do so in those cases because all they showed was it was theoretically plausible. The jury had these two theories, but they didn't go beyond that and actually demonstrably show it was possible. And that was the problem. And I think to show what's happening in Moody and Ali, it helps to think, for example, a tort plaintiff showing negligence. We say they have to show that the defendant was negligent, meaning they exercised care below that a reasonable person would under similar circumstances. When we say that, we're not saying the plaintiff has to show with absolute certainty that the defendant performed below a reasonable person's standard. The standard of proof is one of preponderance of the evidence. So in Moody and Ali, the court's cases were saying, listen, the defendant under plain error has the burden. You have to make a showing, and it's not enough. Our cases have said over and over, it's not enough to show it's theoretically possible. That would essentially be showing something isn't harmless, which that's the standard you get if you preserve the error. But here, we went above and beyond that and showed it was demonstrably possible. And that is because here the evidence showed that Mr. Odom may have loaned his cousin the car, and his cousin committed the robbery unknowingly. And so the district court's omission of the mens rea and telling them to use the ordinary, everyday meaning of aiding and abetting, which encompasses unwitting help, allowed the jury to convict Mr. Odom based on his theory of the case, his defense. So let me go back to the Moody argument, because I'm not exactly following what your argument is. Because in Moody, what the court said, right, this is a case about aiding and abetting and principal liability. And the argument was they messed up the aiding and abetting piece, right? And the court says, no, it slays out the standard. But the analysis is there was sufficient evidence to convict Moody as a principal. And the only question was guilty or not guilty. Therefore, Moody cannot establish the jury relied on aiding and abetting to convict him. So we're constrained, therefore, to affirm, right? So the problem is that looks a lot like what we have here, right? So you've got a principal and an aiding and abetting theory, right? And this is on the what's in the instruction piece, right? So it's plain error. And so we look at it and we say, is there sufficient evidence to convict him as a principal? Right. I'm just literally the words of Moody. Yes. Right. I mean, whatever we say, let's hypothesize the answer to that question is yes. And if that's true and the verdict is a general verdict form, guilty, not guilty. Right. Therefore, your client cannot establish, right, that aiding and abetting was used. And so we must affirm. Right. I mean, that's literally the language of Moody. And one question is maybe Moody's wrong. But if not, what I don't understand is for this claim, how you can get around what Moody itself does and says. So two points on that. Moody cannot overrule the Supreme Court's jurisprudence on Olano's third prong, substantial rights, which they reaffirm Justin Greer as it is a reasonable probability of a different outcome, but for the error. So to the extent Moody is saying we don't care if there's a reasonable probability. It recites that same standard and it says there's no reasonable probability of different outcome where there is sufficient evidence to convict as a principle. I mean, you know, I don't know if that's right or wrong. Right. But that's what they are saying. Right. I mean, I'm just reading in, you know, that that limits us. Right. I mean, maybe the en banc court should say, no, that doesn't work. But what I'm trying to I just want to make sure I understand the arguments you have for why this your case is somehow different from Moody. Right. And if not, that's fine. But I want to make I just want to understand what your arguments are. OK. So two points on that, Your Honor. And first is I don't read Moody in the way you read Moody. And I think that's because Your Honor is quoting Moody's language, which is quoting the Hastings decision and Hastings. It's not quoting anything. I'm reading the last paragraph, which is analysis. It has no case citations. Right. Because the case citations come before it. This is the analysis. This is here. Right. It's applying the cases and it's not quoting anything. I mean, this is its analysis. OK, Your Honor. Well, that goes to the second point, which is you should not read Moody in that context. And I think it's clear when in my reply brief, I point to the briefs. The argument that the Moody court was actually presented with was one of it was just theoretically plausible. All the defendant did in Moody was say, listen, the jury was given principal liability and aiding and abetting liability. But, you know, the aiding and abetting instruction was erroneous. We don't know which one the jury relied on. Therefore, you have to reverse the convictions. And the court went. What's the best support for saying we should narrow Fourth Circuit precedent based on the briefs that were submitted to it? What's the best? What do I go to look to see that instead of taking the language of opinion, I instead look at the briefs? Well, there are decisions that say you should read. You should read the cases in context and the question presented. So, you know, a question that isn't directly presented should not bind courts later presented in brief with that precise question. And that is what's happening here because we briefed. We don't sit on the fact the jury was given two bases. We say, no, no, no. Not only was the jury giving two bases, one of which was wrongly instructed, but we put up a defense that could have very well resulted in acquittal for a properly instructed jury. Now, if there are no further questions on the aiding and abetting, I would like to turn to the other issues, the first being the denial of the district courts, the denial of our forecast challenge to juror number eight. And here, if a legitimate question is raised about a veneer person's ability to perform the duties of a juror, the district court has an obligation to affirmatively dispel those doubts before proceeding. That didn't happen here. And thus, it was an abuse of discretion for the district court to deny our forecast challenge and see juror number eight, who admitted having a hearing issue that resulted in him hearing only, quote, bits and pieces of what the court said. Were you trial counsel? I was not, Your Honor. Were you there? I was not, Your Honor. Have you talked to anybody that was there? I have, Your Honor. And it took place during the pandemic? It did, Your Honor. And tell me about how the courtroom was configured to the extent that you know. See, I think that maybe that had something to do with all this. Honestly, Your Honor, I don't recall. It's been a while, and I know there was a kind of a mock hearing in our district on how to handle pandemic juries, but I was not present. I think it was only like special invitations, and I did not garner one. Maybe your colleague on the other side does. Yeah, maybe he'll be more aware, hopefully. But I will say, notwithstanding the courtroom setup, I think it is probative that juror number eight was the only person. Twenty-nine people were questioned by the court that morning, and juror number eight was the only one to express any difficulty hearing the district court. That's not quite right, right? Didn't the district court express difficulty hearing? Didn't the judge say, I, too, am having trouble hearing in this courtroom? Yeah, sorry. I meant no other veneer persons expressed any difficulty hearing the court. And the judge said, well, when I moved into the microphone, then juror eight said he could hear better, and that resolved it. No, Your Honor. The district court never asked the juror anything. When denying our forecast challenge, the district court just said, I think when I spoke into the microphone, juror number eight could hear. Yeah, juror eight never made any other statement that he couldn't hear something, right? There was one, maybe two questions where he said he couldn't hear. The judge said, I moved into the microphone, and I think that solved it. So how do we, sitting here today, disagree with that? I mean, doesn't the district court have discretion to deal with these things? After all, you and I weren't there. We don't know about your colleague yet. But the district court clearly was. So two points on that. First, I want to address the record in Judge Rushing's point where, I mean, here, what happened, and it's JA 60-62, when juror number eight was questioned, there were 12 questions limited to the juror's career and family, none about the hearing, and three times the juror expressed difficulty hearing the court. Not one question was asked about the juror's hearing impairment. And then second, going to whether or not this court can overturn the district judge when they didn't witness anything. Well, of course we can. I'm just saying that he was there and we weren't. But let me ask you about the first, did your, as I remember it, you didn't try, you didn't use your forecaused challenges at all, is that correct? We used our forecaused, or I mean, excuse me, our peremptory challenges, but we did not use the peremptory challenge on juror number eight. And you didn't bring this up, the defense didn't bring this up later, right? Well, the defense brought it to the court's attention through our forecaused challenge. And at that point, the district court had an obligation before allowing juror number eight to sit and deny our forecaused challenge to affirmatively dispel any doubts. And that comes from this court's decision in Thompson where the court was faced with a juror who was giving wavering answers and couldn't confirm being impartial after seeing an upsetting photograph. You know, I have read all of those cases, and there are cases about the juror and not hearing and whatever, and this just seems to me to be very different, and that's why I'm sort of quizzing you. But I appreciate your answer. Sure. I mean, and it is very different because most of the juror cases admittedly go to bias. It goes to state of mind, and here we have, you know, a potential disability. Sorry, I want to ask you something about supervised release before you sit down. Yes. I have a very specific question, and maybe you can just answer it on when you stand back up. It's fine if you don't know right now. On condition 16 about posing a risk to other people that the probation officer can require the defendant to notify them or the probation officer himself can notify them, at the argument, defense counsel referred to the brief and said, I filed a brief that cites all these cases, and, you know, for that reason, it's an improper delegation. I didn't find that anywhere in the JA or anywhere on ECF. Can you show me, tell me where that was? Where was this argument made to the district court other than at oral argument? I will check the joint appendix and let you know during my rebuttal time. What was said at oral argument didn't seem like much at all to give the district court any notice about this argument, but if this paper, if this written filing is somewhere, then I think that matters. Thanks. Thank you. I see my time has expired, so thank you very much. Counsel, we're happy to hear from you. If you know, you ought to start with Judge Rushing's question. Thank you, Your Honor. The only written document I'm aware of is, I think, document number 45, which is the one in the joint appendix. Objections to the PSR, right? Yeah, and it does not contain those cases. It does not contain any cases about the risk notification condition that I'm aware of. And so, you know, to continue on this point, the district court's response to that question was brief, but it was a pure question of law, pure issue of law. It violates Article III because it's vague. And the court's response to that was, uh-huh, I acknowledge the question, didn't say much more, but the court didn't need to say more to comply with its obligation to enable effective appellate review and show that it understood the question. It had answered previous questions about delegation, and because it's de novo review of, pure de novo review of an Article III question, this court has enough information to decide if there were a substantive reasonableness challenge to decide whether that violates Article III. I do want to move on to the, I'm happy to answer questions about that further, but I'd like to move on to the district court's decision during jury selection. The court acted well within its discretion when it declined to excuse jury for cause. The defendant does have the burden to, through voir dire, establish a disqualification. And I want to make one point here. I don't know exactly how the courtroom was configured. The transcript, I wasn't there either, but the transcript reflects that it was configured for social distancing. I know everybody was spread out and the public was sent to downstairs to watch on TV if they wanted to, so everyone was further apart than they usually are. But a particular feature of this trial was the court allowed the individual parties to question the jurors individually, not propose questions that were filtered, to ask the jurors individually about their experiences, about their partiality. And the defense asked a host of jurors, individually in the group, to the tune of 40 pages, very pointed questions about their experiences with law enforcement, about their personal biases, about their feelings. Had ample opportunity to ask all the questions it wanted and make any record it needed to to establish that the juror was disqualified and chose not to do so. And that's dispositive under this court's decision in Turner, which holds that when you have a factor that's not per se disqualifying, the court can ask further questions or the court can leave it to the parties to do that. And if the parties don't follow up, there's no error, no reversible error.  And we do defer to the district court because the district court, in the words of I think it's Hastings, not Hastings, Hager, the district court's the one on the scene. He understands what's going on. He can observe the demeanor of the defendant. He's the one asking the questions. And he said, you know, I didn't get here. I'm just fine when I spoke into the microphone. I understand part of your colleague's argument to be a little bit of language there, right, that the complaint or part of the complaint the defendant has is that the judge only said, I think he was able to hear. And that if he had said he was able to hear, that would have been good enough. But the think is a problem. What's your response to that? I think it would be totally inconsistent. You think that it would be inconsistent? I think it would be entirely inconsistent with the deference this court gives to district courts to say that it doesn't get deference because he prefaced it with I think. It's the district judge's thoughts that count with respect to explaining what it's doing. And in Wainwright, the Supreme Court said, we're not going to put a requirement that the court write a memorandum or explain its reasoning in any detail on this. And in countless cases, this court has said that the deference during jury selection is particularly high. I think what the court said is perfectly sufficient. And even if the court said nothing, the defendant has the burden to establish the disqualifying factor. Well, maybe I've got another case. But didn't the district court allow the defendant after they asked some questions, the defendant's counsel to ask questions? I'm sorry. I don't think I heard your question, Your Honor. Wasn't the defendant's lawyer permitted to ask questions of the jury? Absolutely. Before and after and of the jurors individually. Individually. And didn't ask any question about this. That is correct, Your Honor. Not one question about this. You did ask one question. You said this is different from the partiality cases. And I think that's correct. This is not partiality. The Supreme Court has said, as I think my friend has acknowledged, partiality is a matter of state of mind. We don't dispute that a juror can be disqualified if they don't meet the statutory requirements of being capable or not being incapable by reason of mental or physical infirmity to render satisfactory jury service. But it's not partiality. And the reason that's significant is because seating a partial juror establishes prejudice. But seating a juror who's not necessarily partial doesn't necessarily do that. Under Dempsey, which is the Tenth Circuit decision that addressed this, there aren't a ton of cases on this, you'd have to show that the seating of the juror affected the fairness of the trial. And I don't think we have any indication of that here. The juror actually was one of the ones who asked the question toward the end of the trial, was very conscientious, and there was nothing in the trial to indicate that there were hearing problems going on. The defense attorney actually said, I'm observing the jurors, and noticed some of them might be dozing a bit, but didn't mention anything about juror number eight. And I think that's relevant, since we're not talking about a partiality situation. The court also didn't plainly err in a way affecting substantial rights when instructing the jury. Certainly, I think the instruction was appropriate. In order to have aiding and abetting, you have to have someone commit the principal offense. We have the video that shows it. You say the instruction was appropriate. You mean giving an aiding and abetting instruction would have been appropriate, not that you agree that this instruction was appropriate? Yes. Both of those statements are correct, Your Honor. Giving an aiding and abetting instruction was appropriate because you have to have a – someone had to have committed the robbery, and the video clearly shows somebody did. You have to have some act, however small, that furthers it, and giving another person the car, something the defense introduced, establishes that element, which is a very, very low bar the Supreme Court has set in Rosemont. And then what establishes his intent to commit his full knowledge of the scope? It's the mask found outside of the Circle K. It's a ski mask in spring in Gastonia, North Carolina, and it has only Mr. Odom's DNA on it. And that is uncontested. So I thought you were going to say that those two are important, but that there's also substantial evidence from, for lack of a better term, the jailhouse snitch. He wasn't always in the jail. But the discussions that he had were really what sort of established knowledge and involvement. Absolutely. That's part of it, too, Your Honor. The ski mask, I think, is important, but the witness also said, not only had he talked about doing robberies for small amounts of money, but he showed this, he had this conversation where he showed an extraordinary interest in finding out exactly when the cashiers at gas stations are checking out, are counting out. And this robbery occurred right when he was counting out. So that is very substantial evidence that. And then the conversation after the robbery where he talks about, got caught slipping with the DNA in the context of a robbery. Absolutely, Your Honor. And that is, frankly, somewhat persuasive testimony because it is so general. If this was a person who was giving us information just to make it up to help himself, he probably would have been more helpful. We don't need to put too much weight on jailhouse snitches, but in this posture we've got to give them full credence, whether that's the right thing for juries to do is a different question, right? That's absolutely true, and I think especially when you're talking about, is there sufficient evidence to support a jury verdict? If you resolve all the evidence in favor of a Section 2 instruction, certainly there's sufficient evidence to give an instruction. Now, I have no doubt, had anyone asked for it, we would have said the Court has to give an instruction about intent. I think the Court did get it right in terms of the actus reus, which is aids, abets, counsels, procures. The Court said that. The Court said you have to find that to find aiding and abetting, so I don't think there's any problem with that. But certainly had someone ask. I think it pushes it a little bit, but probably within the realm of plain error because the Court didn't misinstruct. The instructions are, by definition, not an incorrect statement of the law, and all of the law – You can be incorrect by omission. Certainly, Your Honor. I just do think there's such a – If you say you've got to prove A, B, and C, and you leave out D, right, that's an incorrect statement of law, right? Ordinarily, but in this case, D derives from A, B, and C. Go to your next argument. Certainly. Assert this plain error and go to the next argument. Absolutely, Your Honor. I think Moody speaks plainly in that this Court chooses its rule of decision, and that's the rule of decision it chose, but under any standard. However, it's formulated. The evidence that the Court either – that he was either convicted as a principal or that he was convicted under the proper understanding, or that is to say there's no reasonable probability that the result would have been different, either under an aiding and abetting properly instructed theory or under a principal theory, is overwhelming. Do you think – I mean, is Moody right? I mean, Moody lays out the standard, right, and it says, you know, where there's sufficient evidence that he was guilty as a principal, it matters not that the aiding and abetting piece might have been incorrect, right? Like, that suffices. I mean, that's the full rule of decision. I know this puts you in a difficult position, but we see you a lot, which means that you have a duty of candor that's particularly strong with us. Is Moody right? I mean, it might bind us, but is it really right to say that? Well, I think the state – I agree with – I agree with my friend that the correct statement from the Supreme Court is a reasonable probability of a different result. I do think it's a fair thing to say that this is the appropriate implementation of that standard in this case, and I think it's generally correct that when you have two theories and there's sufficient evidence on both, you have at best uncertainty, which this Court has long held as insufficient and I think is correct. Uncertainty does not meet the defendant's burden to prove a reasonable probability. Your point is that there might be – not this case, not Moody – but there might be such a case in which you have alternative theories, evidence sufficient to support one, and yet the verdict can't stand. Perhaps, Your Honor. It's tough to sort of think through that. I don't think this puts a good – I don't think this creates a good example. I don't think Moody creates a good example, and I can't really think of a good example where you have sufficient evidence on one and the defendant can meet his burden to say, well, we're certain. Maybe if you have a special verdict. Maybe if there are circumstances – That's part of the rule in Moody, right? Part of the rule in Moody is that the verdict form only asks whether Moody was guilty or innocent, not which theory the jury relied upon. So that's – I mean, that is part of a rule that's inherent in Moody itself. Yes, Your Honor. And I think – I'm trying to answer the question. I'm sounding very wishy-washy, and I apologize for that. But I think Moody is a fair interpretation of the statute. I don't know that it is what – or the standard. I'm not sure that I would be arguing that that is the law if I didn't have Moody. So I'll put it that way, and I hope that answers the court question somewhat. But I really think in this case either way the reasonable probability standard isn't there because of that mask. There's just no explanation for why he would have the mask, a ski mask, just outside of a robbery in the very parking lot in which his car was found. If either he wasn't the robber or if he was participating in it in some other way, he either lent his 14-year-old cousin his car or he's there for some reason. If he's not fully knowledgeable, with advanced knowledge of the robbery, it's an overwhelmingly fair inference to say if you have a ski mask on just outside of the robbery and it's got his DNA on it and only his DNA on it and he discarded it in that parking lot next door, that he was either a robber or an aider and abetter under the proper interpretation of the aiding and abetting theory. So I have a little bit of time. I'll go briefly through supervised release conditions because I think this is a case where the court did exactly what it's obligated to do, which is address all arguments, frivolous and not frivolous, head on. Condition 8, defendant shall answer truthfully the conditions asked by the probation officer. The defense said, well, he shouldn't have to, he should put in there that he has to answer, he can refuse to answer on self-incrimination grounds. The court said entirely reasonably, well, that's already the law. That's correct under Minnesota v. Murphy. And entirely reasonable response. I'm not going to put it in there. Condition 9, the defendant shall live at a place approved by the probation officer. The defense said it should be good enough to tell the probation officer and it delegates too much discretion. The court said the probation officer is there to help you and people fall among thieves sometimes when they're on supervised release. So I'm going to leave it in there. Entirely reasonable response. Condition 12, the defendant shall not communicate or interact with any people who know to be a felon. The defense said there's a dissent, didn't cite the case. There's a dissent by Judge Barrett in the Seventh Circuit saying all felons are not equals. The court said, well, maybe Justice Barrett will convince the Supreme Court, but until then I'm going to leave it in there. An entirely reasonable response. The defense didn't give the court much to go on, but the court took what he said and addressed it. Condition 16, that's the one we talked about, Your Honor. The court said enough to enable appellate review. Condition 17, the defendant shall refrain from excessive use of alcohol. The defense said excessive is too fuzzy, too vague. The court said, fine, we'll make it .08, and the defense actually acknowledged. Well, that addresses my argument. No, no, no, no. Then made another. Go ahead. Well, he said that gives me very little argument and then makes a new argument. There shouldn't be any alcohol restriction because he's done well on supervised release. But the court had already said, no, I reject your argument. He'd argued he didn't do anything wrong on supervised release. The jury's verdict was wrong. The court had already rejected that. No, he didn't do well on supervised release. He had a history of using alcohol. He had a history of drug trafficking. I didn't see. I didn't see the history of using. I'm not sure this matters, but I didn't see. I saw drug use but not alcohol use. In the pre-sentence report, he reported social drinking. Well, that's not an abuse. I thought that you originally said it was an abuse of alcohol. We have an abuse with drug things, but I didn't notice that there was any illegal activity connected with alcohol. I didn't mean to suggest that, Your Honor. What I'm suggesting is the defendant argued that he had no problems on supervised release whatsoever. No, I understand that. I totally understand that. That was the defense argument and the court responded. But the use of alcohol wasn't a problem he had on. So the statement was correct, limited to use of alcohol. Oh, that's true, Your Honor. Right, but then he made that argument, I think, to the district judge, and the district judge, he made it more specific, the amount of alcohol you can have. Yes. And I'm unfortunately not very well. There was a time in my life when I knew how much was legal and how much wasn't and what affected, but those days have come and gone. I think .08 is fairly typical for driving statutes. Right. But the original complaint was that it was excessive, it was too fuzzy. So the court made it specific. Condition 17. But that wasn't the end of his objection to it. That wasn't. He said. That takes care of my specificity argument. Yes, and then he said, well, I think you should get rid of it entirely because he's done well while on, he hasn't had any problems while he's on supervised. He had had problems. Yes, he had. But not alcohol problems. That's correct. But the defense didn't say alcohol problems. No, I understand that. That's how I think the court understood it. And I think the court's explanation is reasonable. If this court wanted, if the defense hasn't challenged substantive reasonableness of any of these, but if the defense had, this court would have more than enough to evaluate that question, and that's the standard. Does the court say enough to enable appellate review? Is it fair to say, I mean, we think about this from time to time, but do we say in our supervised release cases that what's a reasonable response to a defense argument depends upon the degree and nature of the defense's argument? I mean, if the defense files a brief with citations and arguments, that requires more of a response than a passing reference. I mean, is that an idea that comes through in our supervised release cases? I don't read them that way, Your Honor. I read them that the court has discretion to do that. Sometimes a short explanation is sufficient. Sometimes it requires something longer, and it depends on the circumstances. The lodestar is always, is it enough information to show that the court considered the argument and enable sufficient appellate review? I think a lot of it could, you could have a huge stack of cases about whether something violates the Constitution, but the court wouldn't have to say much because, well, you know, I don't think it violates the Constitution. It would enable this court to de novo consider whether it violates the Constitution. I think this, and you help me here, this seemed to be, to me, a more thorough review of conditions of supervised release than I've ever seen. It's very thorough, Your Honor, and the court entertained. Addressed every single one of them. I absolutely think so, Your Honor, and the court tried, I think, to address everything, including things that are kind of difficult to understand when faced with that, and it's worth considering. This is a district court on the bench having to deal with this ad hoc. These are arguments the court, some of which, there's very little in that brief that the defense filed. Most of these arguments are brand new. They rely on cases, an unsighted dissent in the Seventh Circuit. I think the court did a pretty good job of responding to some of these. Same thing with the last one, which is, shall participate in the program of testing for substance abuse. Here's another one where the defense kept modifying its argument in response to things the court said. This court has emphasized it's not a game of gotcha, but the court responded to each part of that. The court didn't misunderstand. The court didn't think it was about testing. I see my time is up. I'm happy to continue, but I'm also. No, I'm fine. Okay. I will rest on my briefs and ask that this court affirm the judgment of the district court. Thank you, Your Honor. Thank you so much, Counsel. Counsel, you've got a few minutes. Thank you, Your Honors. So just going to Judge Rushing, I looked back. The only thing the defense submitted prior to the sentencing hearing is 740-745 with the objections. There were no cases on the vagueness. There was a kind of catch-all objection, including number 12, citing an improper delegation at 745. And then I will say, you know. I ask that just because the counsel didn't really state why it's vague, right? And so the district court wasn't really presented with an argument that this is, it's vague to give this, you know, this is an improper delegation because X. So not to fault counsel for, you know, saying there were cases when he didn't actually cite the cases. You know, you cited cases to us, but I just wanted to understand what was in front of the district court. So thank you for that. Yes, you're welcome. And then so just, you know, supervised release conditions were an issue in the Western District for a while, and it actually culminated, I said in my reply brief, a revised standing order issued about six months after this sentencing, where four of the six conditions we objected to were actually removed or materially amended to address our objections. So that was 16, 8, 9, and 7. So the only two that remain are the condition 12, interacting with felons, and number 17, on excessive use of alcohol. So, you know, and just going back, I think, you know, this court's case law is you have to address the central thesis of the defendant's objections, and here that wasn't done. As Judge Motz pointed out with the alcohol restriction, you know, we pointed to the lack of history using it, and so the district court really didn't answer that question. And even now, you know, my friend struggles to address why it's necessary, given the fact all we know is, you know, he has a beer sometimes at football games. He's a social drinker. Now I want to go back to kind of the heart. To be clear, you haven't challenged whether it's necessary for him or not in this appeal, right? You didn't bring a substantive reasonableness challenge. No. You've just challenged the district court's explanation about whether it heard and how it responded. Yes, the district court's explanation arguing it wasn't reasonably related to this defendant. So now I'd like to go and address the aiding and abetting instruction. And here, you know, the government refuses to defend Moody's standard, and they fall back on the Supreme Court standard, a reasonable probability of a different outcome. And instead they argue, you know, this court should. I don't, I don't, I mean, I understand you want to denigrate your colleague, but I don't think he refused to defend Moody at all, right? He talked about that maybe there are exceptions that exist, but to say he refused to defend Moody I think is an unfair characterization of what your colleague said and what I asked. Okay, so maybe it's because I was going to go on and maybe this would help clarify it, but argue that Moody correctly implemented the standard, and that implementation here is a bright line rule that whenever two theories of liability are given, an instructional error on one will defeat any plain error. So essentially here what we have is, you know, the Lockhart in a different setting, right? So here you're essentially saying there can be no plain error when the government presents two theories of liability, because to get there you'd have to say that, so in this case, there have to be insufficient evidence for principal liability. So we don't have to just show a reasonable probability the jury convicted based on the misinstruction. We have to show absolute certainty, because it is only if we can show that there was insufficient evidence for the principal liability, the only basis of liability the jury was correctly instructed on, could we prevail. And that is not the standard, and here it was especially harmful. The jury was given evidence from which they could conclude that Mr. Odom unwittingly assisted. And I see my time's expired, but I'd just like to briefly address some of the factual points that Judge Rushing actually relied on when questioning Mr. Anwright. So just on the ski mask, you know, if it was Mr. Odom's car that his cousin used, the ski mask could have fallen out. You know, I keep an ice scraper. I'm from New England. I keep an ice scraper in my car year-round. It's going to be in there June, just as it would be in there in February. And then second, I want to go to the snitch, or excuse me, Mr. Davidson's testimony. And so just to be clear, you know, the government points to its generalized nature, but here we have sometime in 2007 or 2018. So these statements, him asking a gas station worker, could have been made 14 months before the robbery or after the robbery. And then second, with the comment about him getting picked up on robberies and caught slipping on DNA, well, the DNA swab wasn't even taken until November 20th, and it wasn't even put in a request for forensic testing until 2019. And Mr. Davidson testified that the statements came in 2018. So we would just say this was definitely a question for the jury, and the misinstruction deprived the jury of making that determination of Mr. Odom's guilt. And we would ask this court to reverse the convictions. There are no further questions. Thank you very much. Thank you, counsel. We'll be happy to come down and greet, and then we'll take a very short recess before heading to our third case. This honorable court will take a brief recess.
judges: Julius N. Richardson, Allison J. Rushing, Diana Gribbon Motz